**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WAKEFERN FOOD CORP., <br><br> Plaintiff, <br><br> v. <br><br> TYSON FOODS, INC., <br><br> Defendant. | Case No. 2:24-cv-08933 (BRM)(MAH) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Tyson Foods, Inc.'s ("Tyson") Motion (ECF No. 23) to Dismiss Plaintiff Wakefern Food Corp.'s ("Wakefern") Amended Complaint (ECF No. 20). Wakefern filed an opposition (ECF No. 27), and Tyson filed a reply (ECF No. 29). Having reviewed the parties' submissions filed in connection with the Motion[1] and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Tyson's Motion to Dismiss (ECF No. 23) is **DENIED**.

**I.   BACKGROUND**

**A.   Factual Background**

For the purpose of this motion to dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Wakefern. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document

---

[1] The Court held a premotion and settlement conferences on November 7, 2024 (ECF No. 18) and January 16, 2024. The parties were unable to reach a resolution.

integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).

This matter arises from Tyson's alleged breach of the parties' February 19, 2024 Pricing and Incentive Letter Agreement ("PLA") (ECF No. 21), in which Tyson allegedly agreed to provide Wakefern with certain goods and merchandise ("Products") at agreed upon prices (ECF No. 20 ¶¶ 1–4). Wakefern alleges Tyson "refused to honor its express contractual obligations to Wakefern" and "ceased supplying private label chicken . . . after Wakefern refused to cave to [Tyson]'s extortionate demand for increased prices," all in an attempt to improve its "bottom line without regard to the significant financial and reputational harm caused to Wakefern." (*Id.* ¶¶ 1–2.) Wakefern is "a member-owned supermarket cooperative, comprised of approximately fifty family-owned member companies who independently own and operate more than 300 retail supermarkets in the northeastern United States." (*Id.* ¶ 10.) Wakefern makes large-scale purchases of food and other merchandise, stores it, and distributes it to member companies. (*Id.* ¶ 11.) Tyson is "a large supplier of poultry products, including to Wakefern." (*Id.* ¶ 12.)

Pursuant to the PLA, "[i]n exchange for the pricing guarantee set forth in the [Product Pricing Exhibit ("PPE")[2]], Wakefern agreed to purchase an estimated 100 million annual pounds of the Products." (*Id.* ¶ 21.) The PLA was set to expire on November 1, 2025[3] as set forth in the PPE and it explicitly stated that "this PLA shall not expire prior to that of an incorporated PPE."

---

[2] The agreed-upon prices for the Products were set forth in the PPE attached to the PLA. (ECF No. 20 ¶ 4; ECF No. 21, Ex. A.)

[3] While an exception is set forth in ¶ 3 of the PLA "[i]n the event that a Pricing Term is less than the Term," it does not appear to be applicable, because the "Term" and "Pricing Term" as defined in the PLA are both November 1, 2025. (ECF No. 20 ¶ 18–20; ECF No. 21 ¶ 3.) Even so, where the "Pricing Term is less than the Term," the parties "agree[d] to negotiate an updated PPE in good faith," and Tyson was required to provide 90-days' notice of any price change. (*Id.*)

(ECF No. 20 ¶ 5; ECF No. 21 ¶ 1 & Ex. A.)[4] The parties made "no volume guarantee in connection with the Product(s)," and prices in the PPE were "not contingent upon any required volume unless the parties otherwise agree." (ECF No. 20 (quoting ECF No. 21 ¶ 4).) In the event Tyson foresaw service level falling below 98%, it was obligated to "provide Wakefern with reasonable, advanced written notice, including an explanation and substantiation for the conditions that are temporarily causing the disruption in service." (*Id.* ¶ 22 (quoting ECF No. 21 ¶ 5).) Tyson would also be required to "meet and confer on resolution and mitigation on a weekly basis until the disruption in service [was] fully rectified." (*Id.*)

On May 8, 2024, Tyson representatives visited Wakefern's headquarters and "presented a spreadsheet outlining proposed cost increases . . . total[ing] more than $22 million" and "attempted to renegotiate better terms for itself at higher prices and at Wakefern's expense." (*Id.* ¶¶ 26–29.) Wakefern advised it would not agree to the cost increases and would be adhering to the PLA. (*Id.* ¶ 30.) Wakefern alleges Tyson "essentially g[ave] Wakefern an ultimatum to pay the[] unjustified higher prices or lose its private label poultry supplier," so Wakefern requested that Tyson "provide alternative scenarios and programs" that "would not impose an over $22 million cost increase." (*Id.* ¶¶ 31–32.) Tyson "promised to get back to Wakefern." (*Id.* ¶ 32.)

On June 13, 2024, Tyson informed Wakefern it could only proceed as a supplier for Wakefern if Wakefern agreed to the cost increases; Wakefern again asked for other options. (*Id.* ¶¶ 33–34.) On June 27, 2024, Tyson presented alternative pricing models,[5] including the cost

---

[4] Wakefern alleges that Tyson was supplying the Products at PPE prices for months leading up to the effective date of the PLA (October 1, 2023) and did not attempt to renegotiate prior to entering into the PLA. (ECF No. 20 ¶ 23.) The parties continued to perform "consistent with the PLA and PPE for months" after the effective date. (*Id.* ¶¶ 24–25.)

[5] On July 9, 2024, this presentation was emailed to Wakefern's VP of Meat Division. (*Id.* ¶ 36.)

increases presented in May. (*Id.* ¶ 35.) Wakefern did not agree to pricing set forth in the pricing models, and on July 11, 2024, Tyson informed Wakefern "it was terminating the PLA purely for Tyson's own internal business reasons, and not due to any breach of the PLA by Wakefern," and that it "intended to cease supply to Wakefern under the PLA after the August 25, 2024 delivery, 15 months prior to the contractually agreed upon November 1, 2025 termination date." (*Id.* ¶¶ 37–38.) In other words, as Wakefern states, Tyson "terminated the PLA in order to reap higher profits . . . kn[owing] it was Wakefern's sole provider of private label poultry products and . . . [that] it would cause significant harm to Wakefern." (*Id.* ¶ 39.)

On July 15, 2024, in "another good faith effort to salvage the relationship," Wakefern asked if Tyson would "at least agree to honor the PLA through the end of Wakefern's fiscal year ending September 30, 2024"; Tyson refused. (*Id.* ¶ 40.)[6]

On August 6, 2024, citing significant shortages, Tyson advised Wakefern that "there would be at least a 40% reduction in filling Wakefern's orders effective immediately through August 17, 2024" and that the "reduction would be applied to Wakefern's August 5, 2024 order . . . as well." (*Id.* ¶ 42.) The reductions ultimately impacted orders between July 31, 2024 and August 24, 2024, "amount[ing] to more than 59 thousand cases and over 2.4 million pounds." (*Id.* ¶¶ 42–45.) Wakefern alleges Tyson never provided written notice of the shortages, which should have included an explanation and substantiation for the disruption, in accordance with the PLA. (*Id.* ¶¶ 45–47 (quoting ECF No. 21 ¶ 5).) Wakefern asserts "[t]his is because there was no substantiation for the shortage" and that Tyson "was punishing Wakefern for not acquiescing to its unilateral and astronomical price demands." (*Id.* ¶ 47.)

---

[6] Negotiations on July 17, 2024, initiated by Wakefern, failed as well. (*Id.* ¶ 41.)

4

Tyson ceased to provide the poultry products effective August 25, 2024, causing "significant disruption and destabilization of Wakefern's business," leaving Wakefern "without access to certain private label poultry products . . . and . . . result[ing] in Wakefern paying significantly higher prices to secure any obtainable replacement products." (*Id.* ¶¶ 48–49.)

Wakefern alleges (1) Tyson materially breached the PLA by, without notice, refusing to supply or limiting the supply of the Products, and did not have a valid basis to terminate same (*id.* ¶ 52, 54–63) (Count I); (2) Tyson breached the implied covenant of good faith and fair dealing by "act[ing] maliciously and in bad faith" in "refusing to perform under the PLA" (*id.* ¶¶ 64–72) (Count II); and (3) it is entitled to a declaratory judgment that it is entitled to Tyson's supply of the Products at the PPE prices (*id.* ¶¶ 73–78.) (Count III).

**B.     Procedural History**

On September 3, 2024, Wakefern filed the Complaint. (ECF No. 1.) In accordance with the undersigned's judicial preferences, on October 2, 2024, Tyson filed a letter requesting a premotion conference related to its anticipated motion to dismiss, and on October 9, 2024, Wakefern responded. (ECF Nos. 13, 15.) The Court held a premotion conference on November 7, 2024 (ECF No. 18), and Wakefern filed an Amended Complaint (ECF No. 20) on November 21, 2024, with the Court's permission. Tyson filed the Motion to Dismiss on November 22, 2024 (ECF No. 23), Wakefern filed its opposition on December 23, 2024 (ECF No. 27), and Tyson filed a reply on November 29, 2024 (ECF No. 29). On January 16, 2024, the Court held another conference, requiring all parties with settlement authority to appear. (ECF No. 30.) The parties were unable to reach a resolution.

## II.  LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual

6

claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (emphasis added) (citation omitted). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

### III. DECISION

Tyson argues Wakefern fails to state a claim on all three counts. The Court addresses each count in turn.

#### A. Count I – Breach of Contract

Tyson argues Wakefern fails to point to a specific obligation in the PLA that was breached by Tyson. (ECF No. 23-1 at 1, 6; ECF No. 29 at 1, 3.) It contends the PLA "disclaims the quantity commitment" and "lacks a quantity term that could be breached" (*id.* at 1–2, 6–7), and that the PLA and PPE merely set forth the prices "Tyson *would* charge Wakefern for certain tray pack poultry products *if* Tyson and Wakefern later reached a separate agreement for Tyson to supply such products to Wakefern" (*id.* at 1). To the extent the PLA contained obligations, such as providing notice of shortages, Tyson maintains it complied with those requirements and Wakefern fails to allege otherwise. (*Id.* at 2, 10–11.) Tyson further alleges Wakefern has not alleged damages caused by Tyson's alleged breach. (*Id.* at 11–12.)

Wakefern contends its Amended Complaint sufficiently alleges a breach of contract claim because, at minimum, it satisfies the pleading requirement of *Iqbal*, *Twombley*, and Rule 8. Moreover, Wakefern asserts in the Amended Complaint: (1) the PLA contemplated a quantity of 100 million pounds in consideration for the PPE pricing and that Tyson breached that agreement, and (2) Tyson failed to comply with the PLA's obligation regarding notice of shortages, citing multiple examples. (ECF No. 20 ¶¶ 42–45.) The Court agrees with Wakefern.

To plead a cause of action for a breach of contract, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). "A plaintiff must state facts that allow for the plausible inference

8

that a contract exists and that provisions in that contract were violated." *Abira Med. Lab'ys, LLC v. Nat'l Ass'n of Letter Carriers Health Benefit Plan*, Civ. A. No. 23-05142, 2024 WL 1928680, at *2 (D.N.J. Apr. 30, 2024).

Wakefern has sufficiently alleged a cause of action for breach of contract by alleging: (1) the existence of the PLA and PPE, (2) Tyson's breach of the PLA by failing to provide the Products consistent with the PLA and failing to provide notice of shortages, (3) Wakefern suffered damages, and (4) Wakefern did not breach the contract. The parties present a fundamental disagreement regarding terms of the PLA: Wakefern contends the PLA provided PPE pricing in consideration for Wakefern purchasing (and Tyson supplying) 100 million pounds of product; Tyson argues the PLA is unenforceable as to supply because it merely set the price and required a separate supply agreement. The Court acknowledges that the beginning of the PLA letter, which appears to act as a "wherefore" clause, contemplates the existence of a separate Vendor Supply Agreement. (ECF No. 21 at 1.) However, the PLA also contemplates a disruption to the supply, and Tyson's obligations in those circumstances, without mention of pricing. (*See id.* ¶ 5.) It seems the language of the PLA is ambiguous.[7] The Court finds Wakefern's interpretation to be plausible and finds the Amended Complaint provides "fair notice" to Tyson of Wakefern's claim and "the ground upon which it rests." *See Myers v. MedQuist, Inc.*, No. 05-4608, 2006 WL 3751210, 2006 U.S. Dist. LEXIS 91904 (D.N.J. Dec. 20, 2006). Discovery will provide the Court with more information regarding the scope of the PLA, including the effect of any supply agreement, and Tyson's notices

---

[7] *See also* ECF No. 21 ¶ 4 ("Pricing is offered in consideration of Wakefern purchasing from [Tyson] an estimated 100M annual pounds of Products," but "[Tyson] and Wakefern make no volume guarantee in connection with the Product(s) and the Product Pricing provided in the Exhibits are not contingent upon any required volume unless the parties agree otherwise in an Exhibit.").

(or lack thereof) regarding shortages.[8] Wakefern's allegations are sufficient at this stage, and Tyson's motion to dismiss Count I is denied.

### B.      Count II – Breach of Implied Covenant Good Faith and Fair Dealing

Tyson asserts Wakefern fails to state a claim for breach of the implied covenant of good faith and fair dealing because Wakefern fails to establish "an obligation on Tyson's part to supply" the products. (ECF No. 23-1 at 2, 13–14.) Alternatively, Tyson argues Wakefern cannot assert this independent claim where it is based on the same conduct as the breach of contract claim. (*Id.* at 14–16.)

Wakefern argues the PLA is a valid and binding agreement and that Tyson acted maliciously with bad motive or intent, breaching the implied obligation arising out of the agreement. Wakefern contends Tyson threatened it by providing ultimatums and did so knowing it was Wakefern's sole supplier. The Court agrees with Wakefern.

Under New Jersey law, "every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 778 A.2d 580, 584 (N.J. Super. Ct. App. Div. 2001), *aff'd as modified*, 798 A.2d 1251 (N.J. 2002); *Sons of Thunder, Inc. v. Borden*, 690 A.2d 575, 587 (N.J. 1997) (same). Indeed, a breach of the implied covenant differs from "a literal violation of a contract," *Wade*, 798 A.2d at 1259, and "is an independent duty and may be breached even where there is no breach of the contract's express terms," *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000) (citing *Sons of Thunder*, 690 A.2d at 575). While there is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, "two elements appear to recur with some frequency: (1) the defendant acts in bad faith

---

[8] Wakefern provides multiple examples where it alleges Tyson failed to provide notice. (ECF No. 20 ¶¶ 42–45.) This breach is sufficiently pled.

10

or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Mass. Bay Ins.*, Civ. A. No. 3:09-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387 (N.J. 2005)). In addition, "in the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Collick v. William Paterson Univ.*, Civ. A. No. 16-471, 2016 WL 6824374, at *9 (D.N.J. Nov. 17, 2016); *Wade*, 778 A.2d at 586. Finally, "under New Jersey law, '[a] breach of the covenant of good faith and fair dealing must not arise out of the same conduct underlying an alleged breach of contract action.'" *Irene v. Michael Whaley Interiors, Inc.*, Civ. A. No. 1914998, 2020 WL 759573, at *2 (D.N.J. Feb. 13, 2020) (quoting *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, Civ. A. No. 12-3355, 2013 WL 6048720, at *3 (D.N.J. Nov. 14, 2013)); *Oravsky v. Encompass Ins.*, 804 F. Supp. 2d 228, 239 (D.N.J. 2011) (finding plaintiff's claim for breach of the implied covenant of good faith and fair dealing claim failed at the motion to dismiss stage because that claim was "duplicative of [plaintiff's] breach of contract claim").

Wakefern, multiple times throughout the Amended Complaint, alleges Tyson acted to its own benefit without regard to damages caused to Wakefern. Beyond simply breaching the alleged terms of the PLA, Wakefern argues Tyson acted maliciously in leveraging its power to extort Wakefern into agreeing to higher prices. The Court find this alleged conduct to be separate and beyond the conduct on which the sufficiently pled breach of contract claim[9] is based (*i.e.*, failing

---

[9] To the extent Tyson argues it has no obligation to supply under the PLA or that the implied covenant is inconsistent with its terms, the Court has already found the terms to be ambiguous while finding the Wakefern's interpretation, at this stage, is a plausible one.

11

to supply or provide notice pursuant to the alleged terms of the PLA). Accordingly, Tyson's motion to dismiss Count II is denied.

### C. Count III – Declaratory Judgment

Tyson argues Wakefern is not entitled to a declaration that contradicts the plain language of the PLA, which it asserts contains no obligation for Tyson to supply the Products,[10] and that a declaratory judgment claim would be mooted by success[11] of the breach of contract claim. (ECF No. 23-1 at 2, 16–19.)

Wakefern contends the claims are not duplicative because, beyond a finding Tyson breached the PLA, Wakefern also "requires a judicial declaration setting forth the 'rights' and 'obligations' of the parties" under the PLA. (ECF No. 27 at 15.)

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that a court "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of an interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). District courts have "unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007). When exercising that discretion, a district court must act within the bounds of the Declaratory Judgment Act and in accordance with the principles of "sound judicial administration." *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1245 (Fed. Cir. 2005). Moreover, "[w]hile a declaratory judgment action is not precluded by the existence of alternative form[s] of relief, there is ordinarily no reason to involve its provisions where another adequate remedy is available." *Watkins v. Bai*

---

[10] Again, the Court has already found Wakefern sufficiently alleged, at this stage, Tyson's breach of the PLA. It will not further address this argument.

[11] Tyson does not concede, and in fact opposes the idea that, Wakefern could succeed on its breach of contract claim. (ECF No. 23-1 at 2.)

12

*Rands, LLC,* No.17-2715, 2018 WL 999677, at *4, 2018 U.S. Dist. LEXIS 27237, at *10–11 (D.N.J. Feb. 20, 2018) (quoting *Hammond v. Doan,* 316 A.2d 68, 70 (N.J. Super. Ct. App. Div. 1974)).

At this stage, pending discovery regarding the scope of the PLA, and reading the Amended Complaint in favor of Wakefern, the Court exercises its discretion and finds good cause to allow this claim to proceed.[12] Tyson's motion to dismiss Count III is denied.

## IV. CONCLUSION

For the reasons set forth above, Tyson's Motion to Dismiss (ECF No. 23) is **DENIED**. An appropriate order follows.

Dated:  January 31, 2025                                  */s/ Brian R. Martinotti*
                                                                            **HON. BRIAN R. MARTINOTTI**
                                                                            **UNITED STATES DISTRICT JUDGE**

---

[12] The Court acknowledges Tyson's argument that Wakefern's Opposition was limited and that the breach of contract claim may resolve and preclude the declaratory judgment claim. (ECF No. 9 at 11–12.) Nevertheless, for the reasons set forth herein, the count will proceed.